# EXHIBIT 1

# Media Rights Agreement

## Introduction

This **Agreement** consists of this document, together with **Attachments A** (Schedule of Events)**, B** (Production and Delivery)**,** and **C** (Other Terms and Conditions)**.**

## Definitions

Defined terms are highlighted throughout this **Agreement** in bold (provided that the failure to highlight a defined term in bold shall not modify the meaning of such defined term in such context unless expressly stated otherwise). These are the definitions we use in this **Agreement**:

| Defined Term | Means |
|---|---|
| **Agreement** | This Media Rights Agreement, together with its schedules and attachments |
| **Approved Media** | The official **FloSports** digital and social media pages, OTT apps, mobile apps, and accounts and websites. Any other platforms or mediums must be approved by **L&L** in writing, which approval shall not be unreasonably withheld. |
| **Clips** | Short, edited sections of **Events**. **Clips** from an **Event** shall not exceed ten (10) aggregate minutes per day of an **Event** or four (4) minutes of continuous footage per day of an **Event**. |
| **Distribute** | The distribution, transmission, exhibition, advertisement, duplication, promotion, performance, live stream, broadcast and other media exploitation of content through **Approved Media**. |
| **Effective Date** | December 23, 2019 |
| **Event(s)** | The event or series of events referred to, branded or generally described as **Wodapalooza CrossFit Festival, West Coast CrossFit Classic, Madrid CrossFit Championship, Granite Games, Mayan CrossFit Classic,** and any re-named or substitute event or series of the foregoing owned by **L&L** or to which **L&L** holds the media rights covered by this **Agreement**. "**Event(s)**" includes all live performance or competition related to the **Event(s)** at the **Venue(s)** on the date(s) of the **Event(s).** Without limiting the generality of the foregoing, the **Event(s)** are specifically described in **Attachment A** to this **Agreement.** |
| **FloSports** | FloSports, Inc., a Delaware corporation with headquarters at 979 Springdale Rd., Ste. 120, Austin, TX 78702. References in the **Agreement** to **FloSports** include **FloSports'** successors and permitted assignees. |
| **FloSports Media Rights** | The set of intellectual property and other rights granted to **FloSports** in Section 1 of this **Agreement** |
| **Highlights** | The right of third-party news organizations to distribute short, edited sections of footage, either taken from the **FloSports** production, or taken from |

1

|  | |
|---|---|
|  | footage such third-party news organizations shot themselves. Such **Highlights** shall not exceed three (3) minutes per day of an **Event** total in length, and shall not contain more than 30 seconds of continuous footage per day of an **Event**. |
| **Opt-Out Period** | The period that begins on the date of the last **Event** in 2021 and ends on the date that is sixty (60) days immediately thereafter. |
| **L&L** | Loud and Live Fitness, LLC, a Florida limited liability company with headquarters at 2301 Northwest 87th Avenue, 6th Floor, Miami, FL 33172. References in this Agreement to **L&L** include **L&L's** successors and assignees. |
| **License Period** | The period during which **FloSports** has the right to **Distribute** the **Program**, which is limited to the term of this Agreement and shall terminate upon the expiration or earlier termination of this Agreement. |
| **Program(s)** | A produced live stream or live or delayed broadcast in a digital format of or related to **Event(s)** and other content created or produced in accordance with the terms of this **Agreement**, <u>provided</u> that anything other than a live stream, **Clips** and **Highlights**, portions of the **Events** for promotional use or general content use, or live or delayed broadcast of an **Event** online on **Approved Media** shall require the prior written consent of **L&L**, which consent shall not be unreasonably withheld. |
| **Retained Distribution Rights** | **L&L** retains the rights to distribute the **Events** only as follows:<br><br>- Distribute **Clips** of the **Events** on all **L&L** operated websites and social channels;<br>- Without limiting its ability to distribute **Clips** or **Highlights** (or to allow third-party news organizations to distribute **Highlights**), **L&L** will not use footage during the "live window" of an **Event** in a manner which would reasonably be expected to negatively impact the addition of new subscribers to **FloSports'** live stream of such **Event**. For purposes herein, the "live window" of an **Event** means the duration of the **Event**.<br><br>**L&L** retains the right to give permission to news organizations and third party media outlets to (a) distribute **Highlights** of the **Event(s)** on their platforms and (b) record footage of the **Event** for distribution by such news organizations and media outlets, <u>provided</u> that, with respect to (b), **L&L** shall not allow such news organizations and media outlets to use such footage during the "live window" of an **Event** in a manner which would reasonably be expected to negatively impact the addition of |

| | |
|---|---|
| | new subscribers to **FloSports'** live stream of such **Event**. |
| **Retained Production Rights** | The right for **L&L** to record and distribute **Clips** of the **Event(s)** and other video assets as defined in this **Agreement**.<br><br>The right for news organizations and third party media outlets, that have been granted permission by **L&L**, to record and distribute **Highlights** of the **Event(s)** as defined in this **Agreement**.<br><br>For the avoidance of doubt and without limiting the above, **L&L** and news organizations and third party media outlets shall have the right to produce content that such parties are permitted to distribute under this Agreement and any such production shall fall within the parameters of **Retained Production Rights**. |
| **Rights Fees** | Fees payable to **L&L** pursuant to Section 2 of this **Agreement** |
| **Territory** | Exclusive worldwide |
| **Venue** | The site or the venue where the **Event(s)** are held. |

**Agreement**

On behalf of the entire **FloSports** team, we are pleased to enter into this **Agreement** with **L&L** upon the following terms and subject to the following conditions:

1. **Media Rights**

    a. **Production**

    Except only for the **Retained Production Rights, FloSports** has the exclusive right to record and produce audio, video and other material of or based on the **Event(s)**, which **FloSports** may incorporate into one or more **Programs** and otherwise utilize according to the terms of this **Agreement**. **FloSports** agrees to produce the **Event(s)** and **Program(s)** in accordance with the specifications set forth in **Attachment B**. Notwithstanding the foregoing, **FloSports** does acknowledge and agree that while **L&L** shall not grant any such rights to record and produce the **Event(s)** to any other persons except as otherwise permitted herein, there will be persons (e.g., attendees) at the **Event(s)** which are outside of the control of **L&L** and **L&L** shall therefore in no way be liable for any recordings or products thereof which any such persons may take and/or create without the consent of **L&L**. Notwithstanding the foregoing, for all **Events** after 2020, and for all 2020 **Events** for which it is commercially reasonable, **L&L** shall include messaging on its admission tickets or equivalent locations making it clear that in-venue recording is not permitted, and those caught will be subject to expulsion from the **Event**.

    Nothing herein shall be construed to preclude or otherwise limit **L&L** from recording and producing audio, video and other material of or based on the **Event(s)** and from utilizing such recordings and material to produce **Clips** in accordance with **L&L's Retained Distribution Rights**. **FloSports** hereby grants **L&L** a license to use any and all such photographs, images, video, or audio recordings of **FloSports** (including its name and logos) and its representatives at the **Event** in

connection with the production of **Clips** and the **Retained Production Rights** and the **Retained Distribution Rights**.

b. **Distribution**

Except only for the **Retained Distribution Rights**, **FloSports** has the exclusive right to **Distribute Program(s)** of the **Event(s)** in the **Territory** during the **License Period** in all cases. For clarity, **FloSports** may **Distribute** solely on **Approved Media**.

c. **Intellectual Property**

**FloSports** shall have the exclusive right and is hereby granted a license to **Distribute** the **Event(s)** in accordance with the terms of this **Agreement**. Notwithstanding the foregoing, **L&L** shall be the exclusive owner of the live broadcast recordings of the **Event(s)**.

Notwithstanding anything to the contrary herein, **FloSports** shall not have the right and is not granted a license to alter, modify or use any content which it or any third party records or otherwise obtains in connection with the **Event(s)** in a manner that portrays **L&L** or any other parties involved in the **Event** in a false light or which constitutes defamation of **L&L** or any other such parties.

**FloSports** agrees to transfer any and all footage collected by or on behalf of **FloSports** at an Event(s) to L&L within thirty (30) days after the conclusion of each **Event**.

To the extent that it may do so under applicable law, **L&L** hereby grants to **FloSports** the right and license to enforce copyright as it relates to the **Programs** under this **Agreement** in a manner consistent with the terms herein.

2. **Rights Fee**

Upon the terms and subject to the conditions of this **Agreement**, in full consideration for the **FloSports Media Rights** and the obligations of **L&L** hereunder, **FloSports** will pay **L&L** a rights fee as follows:

a. Payment schedule:
   i. 2020 **Rights Fee**: 
   ii. 2021 **Rights Fee**:
   iii. 2022 **Rights Fee**:

b. **FloSports** will pay **L&L** an amount equal to the above **Rights Fee** in the applicable calendar year divided by the total number of **Events** in such calendar year within forty-five (45) days following the completion of each **Event**. **L&L** shall provide a formal invoice to **FloSports** at ap@flosports.tv within a reasonable period of time after the completion of each **Event**, provided that the failure to provide such an invoice shall not in any way limit the obligation of **FloSports** to pay any amounts which may be due to **L&L**.

3. **Marketing and Promotion**

**FloSports** and **L&L** each agree to promote the **Event(s)** and **Program(s)**, as follows:

a. **L&L** grants **FloSports** the exclusive right to **Distribute** its **Programs.** For clarity, **FloSports** must limit such distribution to **Approved Media. L&L** also hereby grants to **FloSports** the right to include in any such **Program Distributed** in any **Approved Media** the name, likeness and voice of each person appearing in or connected with the **Program(s)** as well as **L&L** names and trademarks and those of any other entity associated with the **Event(s)** and the **Venue** for the limited and reasonable purposes associated with **FloSports'** exploitation of the **Program(s)** in a manner consistent with

4

the terms of this **Agreement**. **FloSports** will not use any of the foregoing as a direct endorsement of any product or other services. Notwithstanding anything to the contrary in this **Agreement**, **L&L** does not grant any rights to **FloSports** or its successors and assigns to use any content containing third party brands (e.g., sponsor marks and logos), individual image and likeness (e.g., athlete image and likeness) or any other such items that are not owned by **L&L** or in which **L&L** does not have any rights, and **FloSports** acknowledges and agrees that it shall be the responsibility of **FloSports** to obtain any such rights from such third parties in order to use any such content in its **Program(s)**. **L&L** agrees to reasonably cooperate with **FloSports** in its efforts to obtain any rights to use content from such third parties, including by undertaking commercially reasonable efforts to have vendors, exhibitors and athletes execute agreements containing applicable release and license language for the benefit of **L&L** and **FloSports**.

b. **FloSports** will have the right to display its name and other trademarks on banners of reasonable size (i.e. not unduly large in the reasonable determination of L&L), its equipment and any broadcasting platform or booth used at the **Venue(s)**, in each case as allocated to **FloSports** by **L&L**. Without limiting the foregoing, **L&L** agrees to provide **FloSports** adequate space and locations such that **FloSports** may display its name and other trademarks in a manner that is readily visible to both spectators at the **Venue(s)** and the viewers watching the **Program(s).**

c. **FloSports** grants **L&L** the right to use **FloSports'** name and trademarks solely in connection with **L&L's** promotional obligations under this **Agreement** and in connection with **L&L's** general promotion of the **Event(s)** (e.g., promotional campaigns and advertisements on social media).

d. **FloSports** will promote the **Program(s)** in a manner reasonably designed for the commercial success of the **Programs** on the **Approved Media**. **FloSports** anticipates using a combination of custom digital display, email newsletters and alerts, social media promotion, and paid and affiliate third-party advertising.

e. **L&L** agrees to help **FloSports** promote the **Event(s)** and the **Program(s)** by making the following promotional efforts and providing access as described:

   i. On a date chosen by **FloSports** that is after December 31, 2019 and prior to the 2020 Wodapalooza **Event**, **L&L** will make a formal announcement of the partnership via digital and social media channels. Prior to release of such formal announcement, **L&L** will submit the proposed announcement to **FloSports** for its approval (not to be unreasonably withheld).

   ii. **L&L**, on all websites and web pages for the **Event(s)** within its control, including but not limited to the main homepage, dedicated pages for each of the **Event(s)**, calendar/schedule page(s), and results page(s), will include the following to promote the **Event(s)**:
   1. A prominent image that links to the **FloSports Event(s)** web page above the fold (i.e. FloElite.com logo and/or "Watch Live on FloElite" lock-up)
   2. Link(s) to the live stream and/or schedule page for the **Event(s)** on FloElite.com, which will be placed on the relevant pages and websites at least four (4) weeks prior to the **Event(s)**.
   3. **FloSports** or FloElite logo
   4. Graphics/display advertising clicking through to the **FloSports Event(s)** web page(s) on FloElite.com (preferably static, not dynamic)
   5. Inclusion in sponsor sections, where **FloSports** or FloElite logos are included in areas designated around the website for sponsors, media partners, etc.
   6. **FloSports** will timely provide **L&L** with the image(s) and links to be used, which images and links must be appropriate in nature.

   iii. **L&L** will send a minimum of two dedicated email blasts per **Event** to its full email database with "Where/How to Watch" information and an image and link to the **FloSports Event(s)** web page or live stream. **FloSports** will timely provide **L&L** with the image(s) and links to be used.

5

Emails will be sent two weeks prior, and again one week prior to, each **Event**, unless otherwise agreed by the parties.
1. In addition to the above, **L&L** will also email all competing athletes with information that includes "Where/How to Watch" information and links for the live streams of the **Events** on FloElite.com and how athletes can share the information on their own social media platforms

iv. **L&L** will from time to time publish posts per **Event** on **L&L's** applicable social media platforms, including but not limited to Facebook, Instagram, Twitter, and YouTube, as defined below:
1. A dedicated post on all social media platforms announcing the partnership between each **Event** and **FloSports**.
2. Minimum of five dedicated posts for each of the **Event(s)** promoting FloElite.com's live streaming schedule and "Where/How to Watch" information across each of **L&L's Events'** social media platforms.
3. Tagging **FloSports**/FloElite on social media posts promoting the live stream and VOD of the **Events** (ex. tagging FloElite or adding live stream link on any **Event** content posted by **L&L** to social media).
4. Uploading promotional videos on relevant websites and social media platforms for each of the **Events** (i.e. wodapalooza.com, Facebook, YouTube, etc.) from time to time in accordance with **L&L's** promotional campaigns as established by **L&L**.
5. **FloSports** will timely provide **L&L** with the image(s) and links to be used and such images and links must be appropriate in nature. Posts shall begin no more than two weeks prior to each **Event** and shall continue through the conclusion of the **Event(s)** in accordance with **L&L's** promotional campaigns as established by **L&L**.

v. **L&L** will regularly include the following in content that is produced by **L&L** that pertains to the **Events** where reasonable and applicable in **L&L's** reasonable judgment:
1. "Where/How to Watch" information
2. An image and link to the **FloSports Event(s)** web page or live stream on FloElite.com
3. Graphics/display advertising clicking through to FloElite.com (preferably static, not dynamic).
4. **FloSports** will timely provide **L&L** with the image(s) and links to be used

vi. **L&L** will provide **Event** assets/marketing materials to aid in the promotion and awareness of the **Events**. This will include, but not limited to:
1. **L&L** to provide video assets, or produced video content, including rights and license to use assets and content in connection with **FloSports'** promotion of the **Events**.
2. **L&L** to provide access, rights and license to the photo library for the **Events** to be used in connection with **FloSports'** promotion of the **Events**.
3. **L&L** to provide high-resolution **Event** logo(s), including rights and license to use in connection with **FloSports** promotion of the **Events**.
    a. As a licensed mark of CrossFit Inc., any usage of the **Event** logos featuring the "CrossFit" mark to be mutually agreed upon
    b. **L&L** will provide versions of the **Event** logo(s) with and without any "CrossFit" marks for use in **FloSports'** promotion of the **Events**.

    4. **L&L** to provide the **Events'** workout schedule that will be featured in the live streams at least 10 days in advance of the each of the **Events**. **FloSports** will not release this information without written approval from **L&L**.

  vii. Each day of the **Events**, **L&L** will cause there to be public address announcements at the **Venue** and at each individual stage at the **Venue** five (5) times per each individual stage each day, promoting the **FloSports** live stream. **FloSports** will provide **L&L** with the copy to be used.

  viii. **L&L** will provide the access for on-site marketing at the **Venue** of the **Events** for **FloSports** in the following manner (with specifics to be agreed upon by the parties acting reasonably and in good faith in connection with each Event):
    1. Digital Billboard/Signage Space
    2. Time on jumbotron that features **FloSports**/FloElite
    3. Inclusion in programs at each of the Events

4. **Venue**

   a. If known at the **Effective Date**, the **Venue(s)** are identified in the **Schedule of Events**.

   b. If not known at the **Effective Date**, **L&L** agrees to provide written notice of the **Venue(s)** to **FloSports** no later than 12 weeks in advance of the relevant **Event(s).**

   c. In the event that **L&L** changes the **Venue** of an **Event** less than 90 days prior to such **Event** and such change results in materially higher production cost to **FloSports**, then **L&L** shall pay to **FloSports** an amount equal to the difference between the planned and final production cost to **FloSports** as evidenced to **L&L** with reasonably detailed documentation, <u>provided</u> that in no instance shall such amount exceed an amount equal to (x) the aggregate **Rights Fee** in the applicable calendar year during which such **Event** is scheduled to take place <u>divided by</u> (y) the total number of **Events** scheduled to take place in such calendar year.

5. **Option to Terminate**

   a. Either party may terminate this **Agreement** if (x) the other party breaches any material term or condition of this Agreement and fails to cure such breach within ten (10) business days from receipt of written notice of such breach or (y) the other party shall have filed a petition for voluntary bankruptcy, or an involuntary petition for bankruptcy shall have been filed against the other party and remains undismissed after sixty (60) days, or the other party shall make a general assignment for the benefit of its creditors.

   b. Either party can terminate this **Agreement**, including without limitation, the obligation to make any future rights fee payments, by providing written or electronic notice to the other party during the **Opt-Out Period**.

6. **Right of First Refusal**

During the term of this **Agreement** and for a period of ninety (90) days after any termination or expiration of this **Agreement** ("**ROFR Term**"), upon receiving any bona fide offer from a third party to provide services after such termination or expiration substantially similar to the services provided by **FloSports** under this **Agreement** in connection with the **Event(s)**, **L&L** must provide **FloSports** with prompt written notice of the terms and conditions of the proposed offer, including without limitation

the fees and consideration to be paid, any license or ownership terms, and the identity of the proposed third party provider. **FloSports** shall be granted a period of ninety (90) days following the later to occur of (i) receipt of such notice, or (ii) the termination or expiration of this **Agreement**, to match, or offer substantially similar or equivalent terms to, the terms in the offer ("**Right of First Refusal**").

If **FloSports** does not agree to the terms in, or offer substantially similar or equivalent terms to the terms of, the offer (as determined by **L&L** in its reasonable discretion and acting in good faith), then upon expiration of the ninety (90)-day period, **L&L** shall be free to negotiate with that third party and to conclude an agreement with such third party on substantially the same terms tendered to **FloSports**. Notwithstanding anything to the contrary in this Section, the **Right of First Refusal** shall not apply in the event that **L&L** terminates this **Agreement** for an uncured material breach.

[*Signature Page Follows*]

Agreed as of the **Effective Date**:

**FloSports, Inc.**

By: _Phil Wendler_     12/24/2019

Name: Phil Wendler

Title: SVP

**Loud and Live Fitness, LLC**

By: _____     12/23/2019

Name: Matt O'Keefe

Title: President, Loud And Live Sports

*Remainder of Page Intentionally Left Blank.*

9

**Attachment A**
**Schedule of Events**

| Event | Date(s) | Venue(s) | Notes |
|---|---|---|---|
| 2020 Wodapalooza CrossFit Festival | February 20-23, 2020 | Bayfront Park (Miami, FL) | |
| 2020 West Coast CrossFit Classic | March 20-22, 2020 | Del Mar Fairgrounds (Del Mar, CA) | |
| 2020 Madrid CrossFit Championship | May 22-24, 2020 | TBD (Madrid, Spain) | |
| 2020 Granite Games | June 12-14, 2020 | TBD (Minnesota) | |
| 2020 Mayan CrossFit Classic | July 3-5, 2020 | TBD (Riviera Maya, Mexico) | |
| 2021 Wodapalooza CrossFit Festival | TBD | Bayfront Park (Miami, FL) | |
| 2021 West Coast CrossFit Classic | TBD | Del Mar Fairgrounds (Del Mar, CA) | |
| 2021 Madrid CrossFit Championship | TBD | TBD (Madrid, Spain) | |
| 2021 Granite Games | TBD | TBD (Minnesota) | |
| 2021 Mayan CrossFit Classic | TBD | TBD (Riviera Maya, Mexico) | |
| 2022 Wodapalooza CrossFit Festival | TBD | Bayfront Park (Miami, FL) | |
| 2022 West Coast CrossFit Classic | TBD | Del Mar Fairgrounds (Del Mar, CA) | |
| 2022 Madrid CrossFit Championship | TBD | TBD (Madrid, Spain) | |
| 2022 Granite Games | TBD | TBD (Minnesota) | |
| 2022 Mayan CrossFit Classic | TBD | TBD (Riviera Maya, Mexico) | |

**Attachment B**
**Production and Delivery**

1. **Event Production: FloSports** agrees to produce the following "**FloSports Produced Events**":

    | Event | Date(s) |
    | --- | --- |
    | 2020 Wodapalooza CrossFit Festival | February 20-23, 2020 |
    | 2020 West Coast CrossFit Classic | March 20-22, 2020 |
    | 2020 Madrid CrossFit Championship | May 22-24, 2020 |
    | 2020 Granite Games | June 12-14, 2020 |
    | 2020 Mayan CrossFit Classic | July 3-5, 2020 |
    | 2021 Wodapalooza CrossFit Festival | TBD |
    | 2021 West Coast CrossFit Classic | TBD |
    | 2021 Madrid CrossFit Championship | TBD |
    | 2021 Granite Games | TBD |
    | 2021 Mayan CrossFit Classic | TBD |
    | 2022 Wodapalooza CrossFit Festival | TBD |
    | 2022 West Coast CrossFit Classic | TBD |
    | 2022 Madrid CrossFit Championship | TBD |
    | 2022 Granite Games | TBD |
    | 2022 Mayan CrossFit Classic | TBD |

2. **FloSports** will produce the **FloSports Produced Events** to the standards and subject to the terms and conditions in this **Agreement** and as generally described in this **Attachment B**. **L&L** and **FloSports** both desire a quality production and agree to reasonably collaborate to achieve it. **L&L** acknowledges that **FloSports'** production and the success of the **Program(s)** will materially depend on **L&L's** performance of its production-related obligations in this **Attachment B**.

3. No later than 12 weeks in advance of any **Event**, **L&L** will provide **FloSports** with phone and email contact information for (a) a **L&L** representative who serves as **Event(s)** director or other person primarily responsible for leading the production of the **Event(s)** and (b) phone and email contact for a responsible party or parties at the **Venue** who **FloSports** may contact and who will help with questions or concerns related to **Venue** access and **Event** production.

4. **Production Standards:** Except as set forth in this **Agreement**, **FloSports** retains the right to determine production standards and formats appropriate for the **Programs** it produces and **Distributes** on **Approved Media** in connection with the **Event(s)**. **FloSports** shall ensure that such standards and formats result in the production of high quality **Programs**. The foregoing shall include and require the following from **FloSports**:

    a. Fully produced HD live stream for each of the **Events**
        i. Expected number of stages/simultaneous streams during each **Event**:
            1. **Wodapalooza CrossFit Festival**: 4
            2. **West Coast CrossFit Classic**: 2
            3. **Madrid CrossFit Championship**: 2
            4. **Granite Games**: 3
            5. **Mayan CrossFit Classic**: 2
        ii. Multi-camera production for each stage/stream
        iii. At least one stream/stage with graphics and commercially reasonable efforts to provide graphics on all streams

    b. Production resources including:
        i. Planning
        ii. Logistics
        iii. Live production and proprietary production processes

11

        iv. Support Teams
        v. Equipment and storage

   c. Commentary/talent for each of the **Events** that is appropriate in nature and with commentators mutually approved by the parties, which approval shall not be unreasonably withheld by either party. **FloSports** shall propose to **L&L** in writing commentators for each **Event** not later than 90 days prior to such **Event** (provided that the foregoing requirement shall not apply to the 2020 Wodapalooza **Event**, for which such written notice must be delivered to L&L within seven (7) days of the date of this **Agreement**). If **L&L** has any objections to commentators proposed for any of the **Events** by **FloSports**, they will inform **FloSports** within seven (7) days of being advised in writing of the proposed commentators. If no objections have been communicated within such seven (7) day period, both parties agree that **FloSports** will be approved to book the commentators that had been communicated to **L&L** in such writing.

   d. **FloSports** to cover all production costs for the live streams of the **Events**, with the exception of any costs noted otherwise in this **Agreement**.

   e. **FloSports** retains the right to determine the length of the **Program(s)**, and to title or retitle each **Program** (provided that such titles must bear a reasonable relation to the content included therein).

4. **Personnel: FloSports** has complete authority over the selection of technical and other personnel utilized in connection with the live stream of the **Event(s)** and the production of the **Program(s)**. **FloSports** retains the right to use in-house audio produced at the **Event(s)** in the **Venue(s)** in the **Program(s).**

5. **"Live Look-ins": FloSports** will provide "live look-ins" during each of the **Events** that will feature two workouts live and in front of the paywall. The workouts and days of the "live look-ins" will be chosen by **FloSports** and communicated to **L&L** prior to each **Event.** Each "live look-in" will be shared on select **FloSports**/FloElite social media platforms.

6. **Sponsorships and Commercials**

   a. **FloSports** has the option to sell one (1) on-site sponsorship for each of the **Events** if it elects to do so with written notice to **L&L** at least sixty (60) days prior to the applicable **Event** (it being understood that such notice is required so that **L&L** may plan its sponsorship allotments accordingly), provided that the foregoing prior notice requirements shall not apply to the **2020 Wodapalooza Event. FloSports** must inform **L&L**, in writing, about any possible sponsor relationships before **FloSports** approaches the sponsors. Sponsors must be pre-approved in writing by the **L&L** and such approval shall not be unreasonably withheld. Sponsors secured by **FloSports** will not compete with existing sponsors and/or partners of the **L&L**, unless approved in writing in advance by **L&L**. All levels of sponsorship will be provided by **L&L** to **FloSports** upon request by **FloSports**. If **FloSports** is unable to sell the one (1) on-site sponsorship, **FloSports** is entitled to the use of said space. **L&L** agrees to provide this on-site sponsorship, at no additional cost to **FloSports**, and will include the following, pass through sponsorship benefits:
        i. One (1) sponsor "Vendor Package"
           1. Includes all benefits that come with "Vendor Package"
           2. Includes 20x10 booth/tent space for sponsor in location consistent with other sponsors that purchased the "Vendor Package".

   b. **L&L** will own 100% of the commercial inventory produced for the video board feed that is displayed on-site at **Events** (**"In-stadium Commercials"**). **FloSports** will provide **L&L** a "clean" feed for the video board at the **Venue**. **L&L** will be responsible for providing and running any **In-stadium Commercials**.

   c. **L&L** will own 65% and **FloSports** will own 35% of the commercial inventory produced on the live stream of the **Events** on **FloSports** (both with respect to the number of commercials and the

amount of time allocated to commercials) (**"In-stream Commercials"**). **L&L** will provide **FloSports** a list of all official sponsors of the **Events** and their appropriate categories at least sixty (60) days priors to each **Event**. **FloSports** agrees to not run any **In-stream Commercials** that directly competes with **L&L** sponsors in these defined categories. **In-stream Commercials** secured by **FloSports** will not compete with existing sponsors and/or partners of **L&L**, unless approved in advance by **L&L**. **FloSports** will be responsible for running any **In-stream Commercials,** with frequency of ad placement to be mutually agreed upon by the parties. All of the **L&L's In-stream Commercials** and/or **In-stream Commercials** from **L&L**'s partners must be provided to **FloSports** a minimum of two (2) weeks prior to each of the **Events** in a format that meets the following specifications:

  i. Video Format: MP4 or MOV
  ii. Video resolution: 640x360
  iii. Max file length: 30 seconds

4. **FloSports Trademarks: FloSports** has the right to display its name, logos and other trademarks on banners, equipment, and any platform or broadcasting booth used at the **Venue(s)** in accordance with Section 3(b) of the Agreement above.

5. **Logistics.** At the **Venue**, **L&L** will procure and provide the **FloSports** production team with:

    a. a locked room suitable for **FloSports'** equipment storage

    b. access to the **Venue** and a reasonable amount of time (generally expected to be 48 hours before and 12 hours after each Event) for equipment load-in and load-out

    c. a base of operations reasonably capable of supporting **FloSports'** production that is as close to the competition or activity in the **Venue** as is commercially practicable and is in no event no more than 50 yards from the **Event** competition or activity

    d. priority camera locations and, where needed for desirable camera angles, platforms (**L&L** acknowledge that in some instances these may block seating; **FloSports** agrees to minimize seating disruption as much as reasonably possible without sacrificing important camera perspectives)

    e. the right to install, maintain and remove from the **Venue** and surrounding premises such wires, cables and equipment as are reasonably necessary for **FloSports** production; **FloSports** agrees such installations will not interfere with the use or operation of the **Venue** by **L&**L or any other third parties at the **Event(s)** or with any means of ingress or egress. The foregoing is subject in all respects to any applicable laws in the jurisdiction(s) in which the **Event(s)** is held and to any agreements between **L&L** and the person or entity granting **L&L** the right to use the **Venue** for the **Event(s)**.

    f. sufficient parking access so that the **FloSports** production team can timely access the **Venue** and park our vehicles without charge, subject to availability at the **Venue**.

    g. sufficient credentials to enable the foregoing

    h. upon request, a reasonable number of tickets (not to exceed 10 in any case) for **FloSports** personnel to attend the **Event(s)**

    i. Covered "PODs" with power at each individual stage at the **Venue** for **FloSports'** production set up

13

j. Riggers to hang **FloSports'** equipment for live stream of the **Events** in a manner and with personnel to be mutually agreed upon by the parties

k. Hotels for **FloSports** commentators/talent (not to exceed 5 in any case) of the **Events**

l. Discounted hotel rooms at each of the **Events** for **FloSports** staff

m. Meals on-site at each of the **Events** for the **FloSports** production team and commentators, each day of the **Event(s)** and including one set up day, in a manner and for personnel to be mutually agreed upon by the parties

n. Dedicated area(s) for athlete interviews at each stage

9. **Internet and Power: L&L** will procure at its cost and provide **FloSports'** production team internet access and connectivity, with download and upload speeds of at least **12 Mbps per stream or field of play**, and L&L will procure at its cost and provide **FloSports** production team access to electrical power reasonably sufficient for **FloSports'** production, in each case as mutually agreed upon by the parties at least 60 days prior to the applicable Event.

14

**Attachment C**
**Other Terms and Conditions**

1. **Representations, Warranties and Covenants:**

    a. **L&L Representations, Warranties and Covenants**. **L&L** represents, warrants and covenants to **FloSports** that:

    i. **L&L** has the full power and authority to make and perform this **Agreement**.

    ii. **L&L** has all rights necessary to its grant of rights to **FloSports** in this **Agreement**.

    iii. The making and performance of this **Agreement** by **L&L** does not violate any agreement with any third party.

    iv. **FloSports** exploitation of the rights acquired under this **Agreement** and pursuant to its terms does not and will not infringe on or violate the rights of any third party.

    v. The **Events** are sanctioned by all material and necessary sports organizations and/or authorities having jurisdiction over them and the **Events** will be conducted according to all material and applicable rules and regulations of such organizations and authorities.

    vi. The **Events** will occur during the **Term** of this **Agreement**.

    vii. **L&L** will not authorize or permit any other recording, exhibition, or **Distribution** of the **Event(s)** by any medium in any manner or by any means except as permitted under this **Agreement** (e.g., in connection with the **Retained Production Rights** and the **Retained Distribution Rights**). Notwithstanding the foregoing, **FloSports** does acknowledge and agree that while **L&L** shall not authorize or permit such recordings, exhibition or **Distribution** except as otherwise permitted herein, there will be persons (e.g., attendees) at the **Event(s)** which are outside of the control of **L&L** and **L&L** shall therefore in no way be liable for any recordings or products thereof which any such persons may take and/or create without the consent of **L&L**. Notwithstanding the foregoing, **L&L** commits to using commercially reasonable efforts to enforce such rights as are properly printed on the back of its tickets pursuant to Section 1(a) of this **Agreement**.

    viii. **L&L** shall comply with Section 507 of the Communications Act of 1934, as amended, in all material respects in connection with the **Event(s)** and the **Program(s)**.

    ix. As between the parties, **L&L** will ensure the **Venue** and staging of the **Event** complies with applicable occupational safety and health laws and regulations in all material respects, and shall provide reasonable cooperation to **FloSports** related to **FloSports** compliance with **FloSports**' obligations under such laws and regulations in all material respects.

    x. **L&L** will not make or cause to be made any voluntary statements, written or oral, or cause or encourage others to make any such statements that defame or disparage the personal and/or business reputations, practices or conduct of **FloSports**.

    xi. **L&L** will not grant any rights inconsistent with the rights granted to **FloSports** by this **Agreement** except as permitted herein.

    xii. Should **L&L** obtain the media rights to any new CrossFit or substantially similar athletic competitions during the **Term of** this **Agreement, L&L** shall first offer such events to **FloSports**

15

and the parties will enter into a good faith negotiation surrounding said rights for an exclusive period of thirty (30) days immediately after **L&L** first offers such events to **FloSports**.

xiii. **L&L** will provide **FloSports** a minimum of five (5) **Events** to produce and **Distribute** during each calendar year of the **Agreement**.

b. <u>**FloSports Representations, Warranties and Covenants**</u>. **FloSports** represents, warrants and covenants to **L&L** that:

i. **FloSports** has the full power and authority to make and perform this **Agreement**.

ii. **FloSports** has all rights necessary to its grant of rights to **L&L** in this **Agreement**.

iii. The making and performance of this **Agreement** by **FloSports** does not violate any agreement with any third party.

iv. **L&L** exploitation of the rights acquired under this **Agreement** and pursuant to its terms does not and will not infringe on or violate the rights of any third party.

v. **FloSports** shall comply with Section 507 of the Communications Act of 1934, as amended, in all material respects in connection with the **Event(s)** and the **Program(s)**.

vi. **FloSports** shall provide reasonable assistance to **L&L** in **L&L**'s endeavor to ensure the **Venue** and staging of the **Event** complies with applicable occupational safety and health laws and regulations in all material respects

vii. **FloSports** will not grant any rights inconsistent with the rights granted to **L&L** by this **Agreement.**

2. **Indemnification**. Each party to this Agreement (as applicable, the "<u>Indemnifying Party</u>") covenants and agrees that it shall indemnify, protect, defend and hold the other party to this Agreement and its officers, directors, managers, agents, employees, members, shareholders, affiliates and successors and assigns (collectively and as applicable, the "<u>Indemnified Party</u>"), harmless from and against any and all claims, liabilities, losses, obligations, judgments, demands, causes of action, damages, costs or expenses, including reasonable attorneys' fees suffered, paid or incurred by them (whether relating to claims between the parties or by third parties) (each, a "<u>Claim</u>") resulting from or arising out of: (i) any material violation of any applicable law, rule or ordinance by the Indemnifying Party, occasioned by negligence or more culpable acts or omissions of the Indemnifying Party, (ii) any accident, incident or occurrence in any way connected to Event(s), which is or was caused by the negligence or more culpable act or omission of the Indemnifying Party and (iii) any material breach by the Indemnifying Party of any agreement, obligation, warranty, representation, covenant or certification made or entered into herein including, without limitation, any agreement, obligation, warranty, representation, covenant or certification made by the Indemnifying Party on behalf of its employees, contractors or other representatives herein. Notwithstanding the foregoing, Indemnifying Party shall not be obligated to indemnify, hold harmless, or defend Indemnified Party against any Claim arising out of or resulting from Indemnified Party's (x) gross negligence or more culpable act or omission or (y) bad faith failure to materially comply with any of its material obligations set forth in this Agreement. The foregoing indemnities are conditioned upon (a) reasonably prompt written notice by the Indemnified Party to the Indemnifying Party of any action, claim or demand for which indemnity is claimed by the Indemnified Party hereunder, (b) the opportunity for complete control of the defense and settlement thereof by the Indemnifying Party (with reasonable consultation with the Indemnified Party from time to time) and (c) such reasonable cooperation by the Indemnified Party in the defense as the Indemnifying Party may reasonably request. If the Indemnifying Party assumes the defense of any such Claim, the Indemnified Party shall have the right to participate in any defense of any claim, action or demand for which

indemnity is claimed with counsel of the Indemnified Party's choice at the Indemnified Party's own expense. Indemnifying Party shall not, without the prior written consent of Indemnified Party, which shall not be unreasonably withheld, conditioned or delayed, settle, compromise or consent to the entry of any judgment with respect to any pending or threatened claim unless the settlement, compromise or consent provides for and includes an express, unconditional release of all claims, damages, liabilities, costs and expenses, including reasonable legal fees and expenses, against the Indemnified Party. The provisions of this Section shall survive the expiration or earlier termination of this **Agreement**.

3. **Force Majeure**: No party shall be liable or responsible to the other party nor be deemed to have defaulted under or breached this **Agreement** for any failure or delay in fulfilling or performing any term of this **Agreement** (except for obligations to make payments to the other party hereunder), when and to the extent such failure or delay is caused by or results from acts beyond the affected party's reasonable control including without limitation: (a) acts of God; (b) flood, fire, earthquake or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (d) government order or law; (e) actions, embargoes, or blockades in effect on or after the date of this **Agreement**; (f) action by any governmental authority; and (g) national or regional emergency. If a force majeure requires that an **Event** be rescheduled or cancelled, then **L&L** shall retain the sole and exclusive right to reschedule and/or cancel such **Event**. If such **Event** is rescheduled during the **Term** of this **Agreement**, then such **Event** shall be deemed part of this **Agreement** without the need to modify the terms herein. If such **Event** is cancelled and will therefore not occur during the **Term** of this **Agreement**, then **FloSports** shall not be required to pay (or shall be entitled to a refund to the extent already paid) of a portion of the **Rights Fee** contemplated by Section 2 of this **Agreement in** an amount equal to (x) the aggregate **Rights Fee** in the applicable calendar year during which such **Event** was scheduled to take place divided by (y) the total number of **Events** scheduled to take place in such calendar year.

4. **Relationship of the Parties:** The relationship of the parties is that of independent contractors with respect to one another, and nothing in this **Agreement** creates any partnership, joint venture, agency or fiduciary relationship between the parties.

5. **Entire Agreement; Amendment:** This **Agreement** and its exhibits and attachments contains the complete understanding of both parties, and supersedes all prior agreements, written and oral, pertaining to its subject matter. This **Agreement** cannot be modified or amended, and terms hereof cannot be waived, except by a written instrument signed by both parties. Parties agree that neither has relied on any statement, representation, warranty or agreement of the other, except those specifically contained in this **Agreement.**

6. **Applicable Law; Jurisdiction; Venue Remedies:** This **Agreement** shall be governed by and interpreted and enforced in accordance with the internal laws of the State of Florida, without regard to conflicts of laws principles that may require application of any other law. Each party hereby irrevocably attorns and submits to the exclusive jurisdiction of the state courts of the State of Florida or the United States District Courts located in the Southern District of Florida for the purpose of any dispute between the parties arising in whole or in part under or in connection with this **Agreement**. Each party agrees that for any proceeding between the parties arising in whole or in part under or in connection with this **Agreement**, such party will bring any proceedings with respect to such disputes only in Miami-Dade County, Florida.  Each party further waives any claim, and will not assert, that venue should properly lie in any other location within the selected jurisdiction. Notwithstanding the previous sentence, (x) a party may commence any proceeding in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts and (y) Buyer (and only Buyer) may commence a proceeding in a court other than the above-named courts in accordance with the provisions of Section 7 "**Nature of Rights**" below. In any proceeding brought by either party against the other, the prevailing party shall be awarded its reasonable attorneys' fees and other costs of suit.

7. **Nature of Rights:** Each party acknowledges that the **Event(s)** and the media rights related thereto are unique and special, and agrees that a breach or threatened breach by such party of any of its obligations under this **Agreement** would give rise to irreparable harm to the other party for which monetary damages would not be an adequate remedy. Each party further agrees that if a breach or threatened breach by either party of any such obligations occurs, the other party will, in addition to any and all other rights and remedies that may be available to it, be entitled to seek equitable relief, including a temporary restraining order, an injunction, specific performance, and/or any other relief that may be available from a court of competent jurisdiction, without requirement to post a bond or other security.

8. **Assignment:** This **Agreement** may not be assigned by either party without prior written approval of the other party, provided that such approval shall not be unreasonably withheld, conditioned or delayed.

9. **Confidentiality:** Each Party agrees to treat the terms and conditions of this **Agreement** and the other party's proprietary information that it may obtain in connection with this Agreement as confidential and agree to undertake whatever measures are reasonably necessary to prevent disclosure to third parties unless disclosure is required by law or written consent of the other party is obtained. Notwithstanding the foregoing, the parties may disclose the terms and conditions of this **Agreement** to their respective attorneys, accountants and other agents in the ordinary course of business, in each instance subject to appropriate confidentiality agreements or obligations.

10. **Remedies:** IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES ARISING OUT OF OR RELATING TO AND/OR IN CONNECTION WITH ANY BREACH OF THIS AGREEMENT REGARDLESS OF (A) WHETHER SUCH DAMAGES WERE FORESEEABLE, (B) WHETHER OR NOT SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (C) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS AGREEMENT.